UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
) Crim. No. 1:17-cr-10304-PBS
v. )
)
JONATHAN ANDRADE, )
Defendant )

## OPPOSITION TO DEFENDANT'S EMERGENCY MOTION
## FOR COMPASSIONATE RELEASE FROM INCARCERATION

The United States of America, by and through undersigned counsel, submits this opposition

to Defendant's Motion for Compassionate Release and Memorandum of Law in Support of Motion

("Def.'s Mot."), filed pro se by Jonathan Andrade ("ANDRADE"), and his counsel's Emergency

Supplemental Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) ("Emergency

Motion") his counsel.   Although sympathetic to the concerns raised by ANDRADE, the

government submits that Defendant's motion should be denied.

*First*, ANDRADE has already tested positive for COVID-19 and has since recovered.

Despite his aggravating factor of obesity, ANDRADE's medical records indicated that he has

suffered no significant adverse consequences from his earlier COVID-19 infection and that his

preexisting medical conditions are being well managed by the medical staff at FCI Fort Dix.

Additionally, ANDRADE was offered the vaccine and refused. For these two reasons, ANDRADE

cannot establish an "extraordinary and compelling reason" to warrant modification of his sentence

pursuant to § 3582(c)(1)(A)(i).

*Second*, the Bureau of Prisons ("the BOP") has taken aggressive measures in light of the

COVID-19 pandemic to mitigate the spread of infection.  Most recently, the BOP has begun

administering vaccinations to staff and inmates, in accordance with the current CDC guidelines,

as they become available.  Although unfortunately there have been COVID-19 outbreaks at various

BOP institutions, including FCI Fort Dix, a COVID-19 outbreak in and of itself is not enough to establish grounds for compassionate release.  Moreover, based on recent reports from the BOP, FCI Fort Dix appears to emerging from an earlier outbreak at the facility.

*Third*, even if ANDRADE were able to satisfy the "extraordinary and compelling reason" threshold necessary to consider compassionate release, the balance of the remaining factors set forth in § 3553(a) weigh strongly against his release.  Under the circumstances, release of ANDRADE would present an untenable risk of danger to the community and would not be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  It would also send precisely the wrong message to the community concerning the seriousness of ANDRADE's prior illegal conduct.

## I.  BACKGROUND

### A.  ANDRADE's Criminal Conduct Underlying His Current Incarceration

The morning of September 15, 2017, at approximately 6:00 a.m., law enforcement arrived at ANDRADE's apartment in Quincy, Massachusetts, to execute multiple search warrants.  PSR at ¶ 9.  Some agents went up to the eighth floor and knocked on his apartment door, while others secured the perimeter.  PSR at ¶ 9.  Upon knocking, those officials on the perimeter "observed an individual throw a black, canvas, messenger-style bag to the sidewalk below."  PSR at ¶ 9.  Video footage later confirmed that bag came from ANDRADE's apartment window.  PSR at ¶ 9, n.1.  Law enforcement then entered the apartment building, where they saw ANDRADE, the only individual in the apartment, standing next to an open window.  PSR at ¶ 10.  He was arrested shortly thereafter.  PSR at ¶ 10.

ANDRADE's belongings were then searched pursuant to the search warrant.  The canvas bag that ANDRADE threw from the window "was found to contain approximately 1,500 grams of

a white powder substance that field tested positive for the presence of cocaine, approximately 2 kilograms of a white powder that was believed to be fentanyl, and approximately 280 grams of a substance that was believed to be cocaine base." PSR at ¶ 9. Law enforcement, in searching the apartment, retrieved a stolen "9mm semi-automatic firearm" from the top drawer of a nightstand next to which ANDRADE consistently slept. *See* PSR at ¶ 10. Also on the nightstand was one of two cell phones intercepted by authorities. PSR at ¶ 10. In the office, authorities recovered "[a]pproximately $20,000, luxury jewelry, and several gold bars . . . ." PSR at ¶ 10. In the kitchen, officers recovered "[b]aggies and a heat sealer . . . ." PSR at ¶ 10.

Law enforcement then turned their attention to Andrade's vehicles which included a BMW, a Nissan Altima, a Chevy Malibu, and a Dodge Van. PSR at ¶ 11. While searching these vehicles, "investigators discovered two electronic hides within the Altima. The hides contained the second cellular telephone that was intercepted during the course of the [investigation], a 'smart watch,' as well as quantities of cocaine and fentanyl." PSR at ¶ 11.

Altogether, law enforcement seized a huge amount of drugs attributable to ANDRADE: 128.83 grams of cocaine base, 3.29 kilograms of cocaine, and 1.2 kilograms of fentanyl. PSR at ¶ 11. Knowing that he was making large sums of money through illegal means, ANDRADE attempted to launder his funds, including over $10,000 in drug proceeds through a Los Angeles based tattoo artist, who used the proceeds to build a tattoo parlor. PSR at ¶ 12. This "business" relationship indicates a particular degree of criminal mindset derived from ANDRADE's dealings.

On January 29, 2018, pursuant to a C plea agreement, ANDRADE pled guilty to Possession With Intent to Distribute 400 grams or More of Fentanyl, 500 grams or More of Cocaine and 28 Grams or More of Cocaine Base, and Heroin; Felon in Possession of a Firearm; Possession of a Firearm in Furtherance of a Drug Trafficking Offense; and Unlawful Monetary Transaction

PSR at ¶ 2.  Consistent with the C plea agreement, the Court sentenced ANDRADE to principally 240 months in prison.

### B.  Background to This Proceeding

On January 11, 2021, ANDRADE wrote to FCI Fort Dix Warden David E. Ortiz requesting compassionate release.  Exhibit A.  In his request, ANDRADE argues that his preexisting medical conditions ("chronic asthma, obesity, heart murmurs, anxiety, depression and shortness of breath") place him in a high-risk category, thereby creating an extraordinary and compelling reason warranting his release.  Exhibit A.  ANDRADE also notes that he has not received any discipline since being incarcerated, has used his time productively while incarcerated, and has admirable plans upon his release.  Exhibit A.

Four days later, on January 15, R. Robinson, the R.I.S. Coordinator responded.  After detailing the current law and BOP policy regarding compassionate release, Robinson requested that ANDRADE resubmit his compassionate release request because it did not fall meet any specific category.  More particularly, Robinson stated that extraordinary and compelling reasons included "the inmate's terminal medical condition; debilitated medical condition; status as a 'new law'[;] elderly inmate, an elderly inmate with medical conditions, or an 'other elderly inmate'; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner."  Exhibit A.  There is no indication that ANDRADE ever resubmitted a request for compassionate release.[1]

---

[1] There remains an open question as to whether ANDRADE actually exhausted his administrative remedies prior to filing his motion.  Because his request was immediately rejected, the response by the R.I.S. coordinator may not constitute a receipt by the warden under the statute.  Because the answer to this procedural issue is unclear, the Government focuses on the substantive aspects of ANDRADE's claim.  While there may be a procedural reason for denying his claim, the substantive reasons present a substantially stronger rationale for denying his claim and are not a close a question.  For these reasons, the Government focuses on the

## II.        APPLICABLE LEGAL FRAMEWORK

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010).  "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases; indeed a district court's discretion to modify a sentence is an exception to [§ 3582's] general rule" barring modification.  *United States v. Cunningham*, 554 F.3d 703,708 (7th Cir. 2009); *cf. United states v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) (noting that 18 U.S.C. § 3582(b) "states that a district court may not modify a term of imprisonment once it has been imposed unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 expressly permits the court to do so").

Section 3582(c)(1)(A) represents an exception to this general rule.  A court may now consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner.

> The court *may not modify a term of imprisonment once it has been imposed except that*, . . . the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, *may reduce the term of imprisonment* . . . .

18 U.S.C. § 3582(c)(1)(A) (emphasis added).  As applicable here, the court can only modify a sentence if, "after considering the factors set forth in section 3553(a) to the extent they are

---

substance of ANDRADE's claim as opposed to the potential procedural shortcomings. Nonetheless, this should not be construed as a concession that ANDRADE has satisfied all of the necessary procedural requirements.

applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i).  The proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  These statements are contained in U.S.S.G. § 1B1.13.  These statements mandate that a release should only occur if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) …."  *See* USSG § 1B1.13(2).

## A. The Extraordinary and Compelling Reason Requirement

The defendant bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").  Once satisfying the threshold precondition of waiting 30 days following the receipt of the defendant's request to the warden, the court may modify a sentence only if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i).[2]  The proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons exist."  U.S.S.G. § 1B1.13 Application Note 1.  Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the

---

[2] Section 3582(c)(1)(A)(ii) provides other bases by which a defendant may be eligible for compassionate release; however, none of these factors are applicable in this case.

Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  *Id.* at App. Note 1(D).  Accordingly, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.  That regulation appears at BOP Program Statement 5050.50.  This program statement took effect on January 17, 2019, following passage of the First Step Act, and contains standards that are both more extensive than and slightly different from those stated in the § 1B1.13 Policy Statement.  As is relevant here, the Program Statement defines a "debilitated medical condition" as follows:

> Debilitated Medical Condition.  RIS[3] consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover.  The BOP should consider a RIS if the inmate is:
>
> - Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
>
> - Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.
>
> The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function).  A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Program Statement 5050.50 at 5.[4]

---

[3] RIS refers to a "reduction in sentence."  Program Statement 5050.50 at 4.

[4] As noted, the Program Statement's provisions regarding the class of inmates eligible for compassionate release is slightly different from the related provision in Section 1B1.13.  To the extent that the Program Statement and the Policy Statement conflict, it is the Policy Statement in Section 1B1.13–*i.e.*, the source directly authorized by statute–that is binding.  An interpretation in the Program Statement that does not contradict the Policy Statement, however, is entitled to some weight.  *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statements, which do not require

Even when an extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that the defendant is not a danger to the public. USSG § 1B1.13(2). And, the court must consider, in general, whether the § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

**B.  BOP's Response to the COVID-19 Pandemic**

The COVID-19 pandemic has presented an unprecedented risk to the worldwide community, including to individuals and staff at jails and prisons. It is a highly contagious virus about which little was known when it first emerged in the United States. Thereafter, public health officials at the local, state, and national levels have continuously sought to provide guidance as to the best measures to prevent and/or limit the spread of the virus.

The BOP has begun administering vaccines to inmates under guidance from the CDC. As of March 24, 2021, 97,108 doses of the vaccine have been distributed to BOP facilities, and 89,271 have been vaccinated. FEDERAL BUREAU OF PRISONS, *COVID-19 Vaccine Implementation*, https://www.bop.gov/coronavirus. BOP's 92% administration rate is indicative of a dramatic increase in efforts to get the virus under control. It is also demonstrative of the fact that BOP is working diligently to make facilities safer for both inmates and employees.

Outside the vaccine, the BOP, after consultation with public health officials, including at the Centers for Disease Control ("CDC"), has implemented a series of policies and procedures designed to prevent and/or mitigate the spread of COVID-19 within its facilities. As health experts learn more, the BOP has continued to refine and implement additional comprehensive procedures relating to screening, testing, treatment, prevention, education and infection control.

---

notice and comment, are entitled to "some deference" where they reflect a "permissible construction of the statute") (internal quotation marks omitted).

The policies and procedures implemented by the BOP have come in various stages, referred to as "Phase I" through "Phase IX." Since March 2020, the BOP began taking extensive measures to modify their operations in an effort to increase social distancing among staff and inmates and to reduce the risk and spread of COVID-19. More specifically, these measures include suspension/modification of social visits and tours, restriction of inmate movement inside and outside of the facilities, health screens and testing of staff and inmates.

In a further step to limit the spread of COVID-19 within the BOP's facilities and decrease its prison population while protecting the general public, the BOP has engaged in an additional step of identifying and designating appropriate inmates for transfer from each of the BOP's facilities nationwide to extended home confinement. This initiative was based upon the Attorney General's expanded authority pursuant to § 12003(b)(2) of the CARES Act, which lengthened the amount of time that the Attorney General may place an inmate in home confinement pursuant to 18 U.S.C. § 3624(c)(2). Pursuant to this initiative, staff at each institution are reviewing each inmate's medical history to determine whether he or she is at increased risk based upon age and vulnerability. The inmate is then assessed upon various other criteria (including, but not limited to, violence or gang-related activity in prison or disciplinary misconduct at BOP within the past year; risk of recidivism; presentation of a demonstrated and verifiable reentry plan that will prevent recidivism and maximum public safety; verification that the release plan would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility; and the inmate's offense of conviction and the assessment of danger posed by the inmate to the community).[5] Should the staff recommend home confinement is appropriate, that

---

[5] *See* Attorney General's Memorandum for Director of Bureau of Prisons, *Prioritization of Home Confinement As Appropriate in Response to the COVID-19 Pandemic* (March 26, 2020),

recommendation then goes to the Residential Re-entry Management Office at the BOP Regional Office for final approval.

Although inmates at institutions having a high incidence of COVID-19 infections were given first priority, the Attorney General mandated that the review should include all at-risk inmates.[6]   As of January 19, 2021, BOP has placed 20,480 inmates on home confinement (including those who have completed their sentences) pursuant to this authority.[7]

## III.   **ARGUMENT**

ANDRADE has not established that he satisfies the requirements of 18 U.S.C. § 3582. "[A] court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; (2) finds that the defendant will not be a danger to the safety of any other person or the community; and (3) the sentencing factors outlined in 18 U.S.C. §3553(a) weigh in favor of reduction."  *United States v. Khawaja*, 471 F.Supp.3d 426, 429 (D.N.H. 2020); *United States v. Miamen*, 2020 WL 19044490 at *2 (D.R.I. April 17, 2020).  "The court has 'broad discretion in deciding whether to grant or deny a motion for sentence reduction.'"  *Khawaja*, 471 F.Supp.3d at 429 (D.N.H. 2020) (citation omitted). Defendant cannot satisfy any of the three prongs of the standard.

---

available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last accessed on March 24, 2021).

[6] Attorney General's Memorandum for Director of Bureau of Prisons, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (April 3, 2020), available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf (last accessed on March 24, 2021).

[7] *See* BOP, *Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic,* available at https://www.bop.gov/coronavirus/faq.jsp (last visited on March 24, 2021).

**A. Andrade Cannot Satisfy The First Prong Because He Has Tested Positive And Has Refused The Vaccine.**

The government does not minimize the risks COVID-19 presents to the defendant or other prisoners serving prison sentences.  The Department of Justice is mindful of the concerns created by COVID-19, which is why BOP is making extensive efforts to move as many appropriate inmates to home confinement as possible.  Nevertheless, despite these initiatives, ANDRADE does not qualify for home confinement.

As to the "extraordinary and compelling" reasons, Defendant argues that he has "risk factor[s] for severe illness if infected by the COVID-19 coronavirus."  Def.'s Mot. at 1.  The government acknowledges that some of Defendant's medical conditions, specifically his obesity, makes him more vulnerable to COVID-19 and that this issue might constitute an extraordinary and compelling reason justifying release under the statute on a different set of facts.  In such a set of facts, ANDRADE would not have tested positive and refused the vaccine. These two conditions fundamentally change the analysis.

1. <u>Testing Positive Substantially Reduces One's Likelihood Of Reinfection</u>

While incarcerated at FCI Fort Dix, ANDRADE tested positive for COVID-19 on December 28, 2020.  Exhibit A.  Despite his underlying health conditions, nothing in his medical records suggests that he suffered from any complications or adverse symptoms as a result.  While the scientific community's understanding of COVID-19 is still evolving, there is significant scientific support for the idea that a person who is infected with COVID-19 is likely to develop some degree of immunity against reinfection.  As the CDC has stated, "cases of reinfection with COVID-19 have been reported, but remain rare."  CENTERS FOR DISEASE CONTROL AND PREVENTION, *Reinfection with COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last updated Oct. 27, 2020).

11

Courts have affirmed the conclusions by the CDC and have refused to render a risk of reinfection as an extraordinary and compelling reason within the definition of 18 U.S.C. § 3582(c)(1)(A). *See United States v. Rivera-Valle*, No. 19-10476-RGS, 2021 WL 102646, at *1 (D. Mass. Jan. 12, 2021) (Stearns, J.) (COVID-19 infection "greatly reduces, although may not entirely eliminate" inmate's risk of being reinfected); see also *United States v. Acevedo*, No. 12-10120-NMG, 2021 WL 242021, at *1 (D. Mass. Jan. 25, 2021) (Gorton, J.) (noting that cases of COVID-19 reinfection are reportedly rare); *United States v. Perry*, __ F. Supp.3d __, 2021 WL 102650, at *1 (D. Mass. Jan 12, 2021) (Hillman, J.) (same), appeal docketed (No. 21-1052).

As a result, courts have repeatedly held that compassionate release is not warranted or permissible for a defendant who has tested positive and recovered from COVID-19. *See, e.g.*, *United States v. Hardy*, No. 11 Cr. 629 (CS), 2020 WL 7711676, at *2 (S.D.N.Y. Dec. 29, 2020) ("This Court and others have declined to find 'extraordinary and compelling circumstances' in cases where defendant has a prior COVID-19 diagnosis") (quoting *United States v. Williams*, No. 11-CR 172, 2020 WL 6826740, at *6 (D. Conn. Nov. 20, 2020)); *United States v. Delorbe-Luna*, No. 18 Cr. 384 (VEC), 2020 WL 7231060, at *2 (S.D.N.Y. Dec. 7, 2020) ("[A] defendant's successful recovery from COVID-19 weighs against granting that defendant compassionate release."); *United States v. Perez*, No. 04 Cr. 937-1 (NRB), 2020 WL 4677586, at *1 (S.D.N.Y. Aug. 11, 2020) ("While it is unfortunate that defendant suffered from COVID-19 while in custody, contraction of a disease generally does not constitute an extraordinary and compelling basis for release. The fact that defendant recovered from COVID-19 further supports this conclusion."); *United States v. Rodriguez*, No. 3 :19-CR-64-19, 2020 WL 4581741, at *2 (D. Conn. Aug. 10, 2020) (observing that a number of district courts "have found an inmate's positive test undermines his case for compassionate release on the basis of his susceptibility to COVID-19 because the main

point of releasing an individual is to decrease the person's chance of contracting COVID-19."); *United States v. Mateus*, No. 14 Cr. 504 (KPF), 2020 WL 5096062, at *4 (S.D.N.Y. Aug. 28, 2020) ("Put simply, Mr. Mateus has already contracted the COVID-19 virus and recovered from it. Other courts have denied compassionate release requests on this basis, and the Court is persuaded by their analyses."); *see also United States v. Cabrera*, No. 18- 304-01, 2021 WL 411502, at *4 (E.D. Pa. Feb. 5, 2021) (collecting cases); *United States v. Gianelli*, __ F.Supp.3d __, 2021 WL 149368, at *2 (D. Mass. Jan. 15, 2021) (Gorton, J.) (listing additional cases).

        With respect to an inmate like ANDRADE who has recovered from his COVID-19 infection, the Government recognizes that some courts have shifted their focus to evaluating the inmate's ongoing need for, and adequacy of, ongoing medical treatments rather than assessing the potential risk of harm to the inmate if he or she were to contract the COVID-19 virus in the first instance. *See, e.g., United States v. Pena*, No. 18-CR-640 (RA), 2021 WL 396420, at *2 (S.D.N.Y. Feb. 4, 2021) ("When a defendant who has already contracted the coronavirus moves for compassionate release, courts have tended to focus more on the defendant's present need for medical treatment and adequacy of the treatment that he is receiving, as opposed to the usual emphasis on the potential risk to him or her – particularly due to one or more underlying health conditions – if he or she were to contract the virus") (internal quotations omitted).  Here, there is nothing in ANDRADE's medical records reflecting any serious complications arising from his recovery from COVID-19.  Thus, while the Government recognizes the challenges and potential impact on prisoners of the necessary precautionary measures that BOP has taken in response to the pandemic, nothing in the unique circumstances and context of this defendant warrants his release prior to the completion of his sentence.

2. <u>Courts Have Held That A Defendant Cannot Assert A Right To Compassionate Release When Offered And Refused Vaccination.</u>

BOP has made significant strides in administering the COVID-19 vaccine to ensure that those most vulnerable remain safe from infection. This is especially clear from BOP's 92% administration rate. ANDRADE was offered the COVID-19 Pfizer-BioNTech vaccine on January 21, 2021. 2020-21 BEMR at 22, 29. This particular vaccine is 95% effective in preventing transmission of the virus. *Information about the Pfizer-BioNTech COVID-19 Vaccine*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html. However, ANDRADE declined his opportunity to be vaccinated. Ex. B. In other words, ANDRADE declined his opportunity to be 95% protected from the virus in environment he contends is conducive for transmission.

When a defendant is offered the vaccine and refuses, an overwhelming majority of courts have found that extraordinary and compelling circumstances warranting compassionate release cannot exist. *See, e.g.*, *United States v. Martinez*, No. CR18023901PHXSPL, 2021 WL 718208, at *2 (D. Ariz. Feb. 24, 2021) (holding that, because Defendant had contracted and then "refused the vaccine, th[e] Court has found that fact undercuts the argument that risk of serious illness from contracting COVID-19 is 'an extraordinary and compelling reason for his immediate release.'") (citing *United States v. Williams*, No. CR1701279001PHXDLR, 2021 WL 321904, at *3 (D. Ariz. Feb. 1, 2021)) *United States v. Jackson*, No. 15CR2607PAMTNL, 2021 WL 806366, at *2 (D. Minn. Mar. 3, 2021) ("[Defendant's] decision to refuse the vaccine flies in the face of any medical recommendation regarding the vaccines. While he is within his rights to refuse any treatment he wishes to forego, he cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk."); *United States v. Robinson*, No. CR 16-94, 2021 WL 719658, at *1 (W.D. Pa. Feb. 23, 2021) ("[R]efusal is notable,

however, given the widescale desperation − of many in the general public − to acquire the same opportunity he has declined. . . . [I]t seems fair to conclude that his decision significantly undermines the foundational premises of his Motion [for compassionate release].”); *United States v. Reynoso*, No. CR 17-10350-NMG, 2021 WL 950081, at *2 (D. Mass. Mar. 12, 2021) (stating that “the sincerity of [a defendant’s] concern for his health is dubious given that he rejected the opportunity to receive the COVID-19 vaccine” and rejecting the motion for compassionate release on these grounds); *United States v. Darrell Newton*, No. 1:17-CR-00073-JAW-1, 2021 WL 966862, at *8 (D. Me. Mar. 15, 2021) (finding that, when an obese defendant who had previously contracted COVID refused the Pfizer-BioNTech vaccine and then claimed to be in fear of complications from reinfection, their position is contradictory).

ANDRADE’s arguments, as sympathetic as they may be, are significantly weakened by his refusal to be vaccinated.  It would be paradoxical to allow a Defendant to refuse a vaccine and ignore the mitigating factors that could help stem one’s risk.  Additionally, it would undermine the legitimacy of this court if a defendant could create a workaround where they were able to refuse a measure designed to keep them safe and then claim that “extraordinary and compelling” reasons exist for their release.  Thus, this court should find that there are not, and cannot, be compelling reasons for his release given that he has tested positive and refused to receive the 95% effective Pfizer-BioNTech vaccination.

### B.  ANDRADE Has Received Adequate Medical Care While Incarcerated and His Underlying Medical Conditions Appear to Be Well-Controlled

COVID-19 remains a relatively new disease and much continues to be learned about the disease on a daily basis. The CDC is regularly reviewing and revising the risk profile for individuals with certain underlying medical conditions as more data is collected and analyzed.

Based upon this review, the CDC has identified certain individuals, based upon their increased age and/or preexisting medical conditions, who are at an increased risk of severe illness.

The CDC currently has identified the following preexisting medical conditions of placing individuals at any age "**at increased risk** of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); down syndrome; heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher but < 40 kg/m2); severe obesity (BMI ≥ 40 kg/m2); pregnancy; sickle cell disease; smoking; and Type 2 diabetes mellitus." *See* CENTERS FOR DISEASE CONTROL, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  (last accessed March 24, 2021) (emphasis in original) (hereinafter "CDC COVID-19 Guidance").  While ANDRADE does have an underlying health conditions of obesity, as is indicated by his BMI of 33.1, he suffered no significant adverse consequences even after being infected with COVID-19.  2019-20 BEMR at 1.  To the contrary, his records indicate that he remained relatively healthy even immediately following his diagnosis, maintaining a stable blood pressure.  2020-21 BEMR at 3.  Additionally, the records reflect that ANDRADE continues to receive appropriate routine care and that his medical conditions are well-managed and under control.

ANDRADE cites to other health issues including "pre-diabetes, heart murmurs, shortness of breath and gastro-intestinal issues."[8] *See* Def.'s Mot. at 3.  However, these medical ailments are

---

[8] None of these medical conditions present an increased risk of serious illness should an individual contract COVID-19.  In fact, these conditions have not even been identified by the CDC as conditions that "**might**" place an individual at an increased risk for severe illness were they to contract COVID-19.  *See* CDC COVID-19 Guidance (emphasis in original).

not particularly uncommon for someone in their mid-50s and "while [certain underlying medical conditions that do not present a significant risk of COVID-19 complications are] understandable concerns, they are not 'extraordinary and compelling.'" *United States v. Hardy*, 470 F. Supp.3d 61, 62 (D. Mass. 2020) (Stearns, J.); *see also Rivera-Valle*, 2021 WL 102646, at *1 (concluding that obesity is "neither uncommonly grave nor life-threatening" and that defendant did not meet "extraordinary and compelling" threshold requirement for compassionate release).  Other courts have similarly concluded that "nothing in the guidelines promulgated by the Centers for Disease Control and Prevention ("CDC") suggests that pre-diabetes puts one at a higher risk for severe illness from infection.  *United States v. Livingston*, No. 18-CR-416 (ENV), 2020 WL 1905202, at *3 (E.D.N.Y. Apr. 17, 2020);*see also United States v. Gonzalez*, 467 F. Supp. 3d 1075, 1082 (D. Colo. 2020) (holding that obesity and heart murmurs do not qualify as conditions warranting compassionate release because they are neither extraordinary nor compelling).  As such, not even ANDRADE's obesity necessitate a finding of an extraordinary and compelling reason for his release.

### C. The Outbreak of COVID-19 at FCI Fort Dix Is Not an "Extraordinary and Compelling" Basis for Compassionate Release

The measures that the BOP has adopted to combat the COVID-19 virus have proven successful to varying degrees at its facilities throughout the country.  Unfortunately, despite BOP's best efforts, there have been outbreaks of the virus at a number of facilities including FCI Fort Dix. According to the BOP website, FCI Fort Dix, as of March 24, 2021, has three inmates and 41 staff who have confirmed COVID-19 infections, and has 1,821 inmates and 47 staff who have recovered from earlier COVID-19 infections.[9]  *See* BUREAU OF PRISONS, *Covid-19 Cases*,

---

[9] The facility has unfortunately also reported one inmate death as a result of COVID-19.

https://www.bop.gov/coronavirus/ (last visited March 24, 2021). While obviously cause for concern, these numbers suggest that the situation at FCI-Fort Dix has improved dramatically over the past two months. *Compare United States v. Johnson,* No. 2:08-374, 2021 WL 409830, at *9 (W.D. Pa. Feb. 5, 2021) (observing that as of January 4, 2021, there were 586 inmates and 12 staff with active cases of COVID-19 at Fort Dix). "BOP's highest priority is to continue to do everything it can to mitigate the spread of COVID-19 in its facilities, and it has taken significant measures to protect the health of the inmates in its charge." *Cabrera*, 2021 WL 411502, at *2 (internal quotation omitted).

As this Court and several other courts have recognized, a COVID-19 outbreak within an institution, while unfortunate and troubling, is not, in and of itself, a sufficient basis for granting compassionate release to all inmates within that institution. "[T]here must be a means of differentiating those eligible for release from those who are not." *Hardy*, 470 F. Supp.3d at 62; *see also Rivera-Valle*, 2021 WL 102646, at *2. "Because COVID-19 poses a general threat to every non-immune individual, the mere existence of the disease does not provide a basis for a reduction in sentence on its own." *Id.* at *4.

Thus, even at institutions where there has been a COVID-19 outbreak, compassionate release of all inmates at the affected institution is not warranted. *See, e.g., United States v. Altashy*, No. CCB-17-182, 2021 WL 409743, at *3 (D. Md. Feb 5, 2021) (finding that the defendant's underlying tuberculosis condition was not "extraordinary and compelling" and that the conditions at FCI Fort Dix did not provide grounds for a reduction in sentence); *Johnson,* 2021 WL 409830, at *9 (denying request for compassionate release where defendant had already contracted COVID-19, but was asymptomatic, and rejecting argument that the conditions at FCI Fort Dix constituted an extraordinary and compelling reason supporting defendant's compassionate release).

### D. The § 3553(a) Sentencing Factors Support ANDRADE's Continued Incarceration

Even if ANDRADE's medical conditions provided an extraordinary and compelling reason warranting consideration for compassionate release, which they do not, he must still demonstrate that his proposed release is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  This requires consideration of the factors expressed in 18 U.S.C. § 3553(a)—including, *inter alia*, "the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to provide the defendant with needed . . . medical care or other correctional treatment; the applicable guidelines; and pertinent Sentencing Commission policy statements."  18 U.S.C. § 3553(a).

The scale tips heavily in favor of his continued incarceration.   Most significantly, ANDRADE is a Career Offender who bargained for, and received, a sentence below the Guidelines range.  He also faced *three* separate mandatory minimum terms: ten years for the drugs (Count One); 15 years on the felon in possession charge (Count Two); and another five years for the 924(c), consecutive to Count One (Count Three).  ANDRADE earned this ranges by possessing a huge amount of drugs – fentanyl, cocaine base, and cocaine – and drugs.

### E.  Public Safety Requires ANDRADE's Continued Incarceraton.

ANDRADE is a repeat offender with a long history of drug dealing, including fourteen prior arrests, one additional pending charge, and a criminal history score of 10.  PSR at ¶ 30–47. Ten of these offenses involved possession or possession with intent to sell drugs, which form a pattern with the instant offense.  PSR at ¶ 44.  Not only is ANDRADE's risk of recidivism theoretically high given his classification, there is a strong indication that, given his repeat offenses, he would recidivate.  For example, ANDRADE was arrested in 2003 for possessing with intent to distribute a class D drug near a school zone or park.  PSR at ¶ 33, 34.  He even served

time for this offense.  PSR at ¶ 33, 34.  Five years later, in 2008, he was arrested and served time again for possession with intent to distribute a Class B drug.  PSR ¶ 39.  Most recently, in 2014, ANDRADE was arrested for possession with intent to sell Class A (Heroin), Class B (Cocaine), and Class D drugs near a school zone or park.  PSR at ¶ 47.[10]

Despite Defendant's claim of rehabilitation, ANDRADE continues to violate the law shortly after his release.  Given the similarity of the instant offense to his prior convictions, it remains highly probable that ANDRADE will continue to carry large quantities illicit substances that harm our communities.  For instance, he was most recently arrested for possession with intent to distribute heroin and cocaine, and this offense involved fentanyl and cocaine, some of the deadliest drugs.  Additionally, the instant matter, ANDRADE was found to be in possession, and close proximity to a firearm despite being a convicted felon.  Not only did this aggravating factor put law enforcement at risk, it risks harm to the community.  There is no question that such conduct presents an untenable risk of harm to the community were he to be released at this time.  And given his track record of possession with intent to distribute dangerous drugs. it is likely that he will continue to do so upon his release.  This conduct belies any claim that ANDRADE presents no risk of harm to the community were he to be released at this time.

## IV.   CONCLUSION

The COVID-19 pandemic is an unprecedented public health emergency that has caused great concern throughout the world.  It does not, however, require the release of all federal inmates. ANDRADE dealt with significant quantities of cocaine, profited off the addiction of others, and demonstrated a disregard for the law over an extended period of time.

---

[10] This charge is pending before the Barnstable District Court.

For the foregoing reasons, the Court should deny Defendant's Motion for Modification of

Sentence and Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Date: March 24, 2021                    By: */s/ Timothy E. Moran*
                                        Timothy E. Moran
                                        Glenn A. MacKinlay
                                        Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I, Timothy E. Moran, hereby certify that the foregoing was filed through the Electronic
Court Filing system and will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing.

Date: March 24, 2021                    */s/ Timothy E. Moran*
                                        Assistant United States Attorney